Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL X

| | | |
|---|---|---|
| BANCO POPULAR DE PUERTO RICO<br><br>Apelado<br><br>V.<br><br>**FERDINAND MELÉNDEZ TORRES** t/c/c FERDINAND ENRIQUE MELÉNDEZ TORRES; FERDINAND MELÉNDEZ ROMÁN, por sí y como miembro de la Sociedad Legal de Bienes Gananciales compuesta con NILSA MARINA TORRES DÁVILA t/c/c NILSA M. TORRES DÁVILA; NILSA MARINA TORRES DÁVILA t/c/c NILSA M. TORRES DÁVILA por sí y como miembro de la Sociedad Legal de Bienes Gananciales compuesta con FERDINAND MELÉNDEZ ROMÁN<br><br>Apelante | KLAN202500422 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Caguas<br><br>Caso Núm.: CG2022CV01767<br><br>Sobre: Cobro de Dinero y Ejecución de Hipoteca por la Vía Ordinaria |

Panel integrado por su presidenta; la Juez Lebrón Nieves, la Jueza Romero García y el Juez Rivera Torres

*Lebrón Nieves, Juez Ponente*

### SENTENCIA

En San Juan, Puerto Rico, a 26 de junio de 2025.

El 12 de mayo de 2025, compareció ante este Tribunal de Apelaciones, el señor Ferdinand Meléndez Torres (en adelante, parte apelante o señor Meléndez Torres), por medio de *Apelación.* Mediante esta, nos solicita que revisemos la *Sentencia de Desestimación a Reconvención,* emitida el 12 de febrero de 2025 y notificada el 19 de febrero de 2025, por el Tribunal de Primera Instancia, Sala Superior de Caguas. En virtud del aludido dictamen, el foro *a quo* ordenó la desestimación con perjuicio de la

*Reconvención* instada por la parte apelante y declaró Ha Lugar la moción de desestimación presentada por el Banco Popular de Puerto Rico (en adelante, parte apelada o BPPR).

Por los fundamentos que adelante se exponen, se confirma el dictamen apelado.

**I**

Los hechos que suscitaron la controversia de epígrafe se remontan a una *Demanda* sobre cobro de dinero y ejecución de hipoteca, presentada por BPPR en contra de la parte apelante. Se desprende de las alegaciones de la *Demanda* que, la parte apelada le concedió al señor Ferdinand Meléndez Román, la señora Nilsa M. Torres Dávila y la Sociedad Legal de Bienes Gananciales compuesta por ambos, un préstamo sobre una propiedad por la cantidad de $242,900.00, con intereses al siete por ciento (7%) y a vencer el 1 de agosto de 2037. Posteriormente, fue modificado por la parte apelante el 23 de mayo de 2019, a la cantidad de $249,144.44, con intereses del 7% anual y a vencer el 1 de mayo de 2049. A tales efectos, Popular Mortgage Inc., emitió un Pagaré Hipotecario pagadero o a su orden, y su modificación pagadero a BPPR o a su orden por las sumas antes dispuestas. BPPR sostuvo que, se encontraba en posesión del original del Pagaré Hipotectario y su *allonge*. Por lo anterior, argumentó que es el tenedor del pagaré y quien ostenta el derecho a exigir su cumplimiento, y que sus gestiones tendentes al cobro de las cantidades adeudadas habían sido agotadas. Añadió que, la parte apelante era responsable del pago del Pagaré Hipotecario, en calidad de firmante y emisora de este.

Asimismo, arguyó que, la parte apelante había incumplido con su obligación de realizar pagos bajo el aludido préstamo y a la fecha de la presentación de la *Demanda* adeudaba una suma de $254,240.69, más los intereses acumulados desde el 1 de agosto de 2020, los cuales aumentarían hasta el saldo total de la deuda, más

cargos por mora y cualesquiera otros adelantos que se hicieran en virtud del pagaré y la escritura de la hipoteca. Por lo anterior, declaró vencida la totalidad de la deuda. Consecuentemente, le solicitó al foro recurrido que dictara sentencia a su favor con los siguientes pronunciamientos:

(a) Condene a la parte demandada a pagar al BPPR solidariamente las sumas reclamadas en la demanda;

(b) Ordene la ejecución de la finca mediante su venta en pública subasta para satisfacer, hasta donde alcance el producto de dicha venta, el balance de la deuda.

(c) Disponiendo que, una vez celebrada la subasta y adjudicada la propiedad al mejor postor, el señor Alguacil haga entrega material de dichas propiedades subastadas al adjudicatario, teniendo a tal fin la Sentencia el efecto de un auto posesorio, y en los casos que fuere necesario, procediendo al lanzamiento de los ocupantes de la propiedad subastada;

(d) Disponiendo que, el producto de la venta judicial, se proceda a satisfacer al BPPR la totalidad de la Sentencia, incluyendo sin limitación, la suma pactada para costas y honorarios de abogado, más los gastos de la venta judicial y si hubiere algún remanente y no hubiere gravámenes posteriores, disponiendo que el mismo le corresponde a la parte demandada, el cual le sería entregado mediante posterior orden del Tribunal;

(e) Disponiendo que en caso de que el producto de la venta no fuere suficiente para satisfacer la totalidad de la Sentencia dictada y los gastos de la venta judicial, se expida Orden y mandamiento de Embargos y Ejecución proveyendo para la venta y ejecución de cualesquiera otros bienes muebles o inmuebles de la parte demandada, hasta dejar pagada cualquier deficiencia o parte insoluta de la Sentencia y de los gastos de ambas ventas judiciales;

(f) Disponiendo que una vez vendida y adjudicadas las propiedades inmuebles en las subastas y previo los trámites de Ley correspondientes, se cancele el Pagaré Hipotecario objeto de esta Demanda;

(g) Ordenando además en la Sentencia, para que, por el Registrador correspondiente, se proceda a la cancelación de gravámenes posteriores a la hipoteca de la parte demandante, que surjan en el Registro.

En respuesta, la parte apelante presentó la *Contestación a Demanda y Reconvención*. En primer lugar, sostuvo que, BPPR por sus propias acciones se encontraba impedido de presentar la causa de acción de epígrafe, por motivo de que oficiales del banco refirieron el caso en dos (2) ocasiones a *loss mitigation* y violentaron los acuerdos suscritos en el procedimiento conforme a la legislación local y federal. Acotó que, BPPR lo mantuvo en un proceso dual, ya que, no notificó al Tribunal sobre el proceso de *loss mitigation* y que tal acción estaba en contravención con la Reglamentación X. Arguyó que, el Tribunal de Primera Instancia se encontraba obligado a referir a las partes a someterse al proceso de mediación de conflictos conforme establecido en la Ley núm. 184 del 17 de agosto de 2012.

En cuanto a la reconvención, la parte apelante sostuvo que, el 5 de agosto de 2022 se orientó con la División de *Loss Mitigation* de BPPR. Más adelante, logró un acuerdo de pago con el BPPR y aseguró que, se mantuvo en constante comunicación con oficiales de BPPR en miras de lograr el pago de lo adeudado o que le brindaran opciones razonables para refinanciar o vender la propiedad en un proceso de *short sale*. Afirmó, además, que entregó todos los documentos solicitados por el BPPR. De igual forma, alegó que como parte del proceso de *loss mitigation* se mantuvo negociando la opción de *short sale* con el BPPR, y que, dicho proceso duró un año. Sin embargo, indicó que, luego de lograr un acuerdo, el BPPR se retiró del proceso de negociación de mala fe e indicó que conforme a la reglamentación federal, el proceso de *short sale* solo podía durar un año. Añadió que, el BPPR luego de "cerrar" el primer caso de *loss mitigation*, obligó al señor Meléndez Torres a iniciar un segundo proceso de *loss mitigation* y *short sale*.

Asimismo, la parte apelante adujo que, iniciado el segundo proceso de *loss mitigation*, el BPPR presentó la *Demanda*, lo que conllevó que se iniciara un proceso dual. De igual forma, la parte

apelante alegó que, en el segundo proceso de *short sale,* BPPR sugirió un precio distinto al sugerido en el primer proceso. La parte apelante también mencionó que, aunque se encontraba en el proceso de *loss mitigation,* tuvo que comenzar un proceso de mediación compulsoria. Sin embargo, arguyó que, en el proceso de mediación, BPPR no le brindó alternativas distintas a la oferta de *short sale* sugerida, y que dicho proceso fue uno de mala fe. Es la postura de la parte apelante que, fue engañada de forma dolosa en el proceso de *loss mitigation* ofrecido por la parte apelada. Incluyó, además, una causa de acción por daños y perjuicios e incumplimiento de contrato en contra de BPPR. Finalmente, le solicitó al foro apelado que declarara Ha Lugar su *Reconvención,* y le ordenara al BPPR ejercer la oferta de *short sale* por la cantidad de $203,098.00, es decir, la cantidad propuesta en el primer proceso de *short sale.*

Por otro lado, BPPR presentó la *Moción Solicitando Desestimación Reconvención.* La parte apelada sostuvo que, el 13 de junio de 2022 le había notificado al foro *a quo* que, la parte apelante había sometido todos los documentos necesarios para ser evaluada bajo *loss mitigation* y que al amparo del *Consumer Financial Protection Bureau* (en adelante, CFPB), no presentaría moción dispositiva alguna, hasta tanto adviniera en conocimiento de si se había aprobado o aceptado alguna alternativa de pago. Mencionó que, no fue hasta el 10 de abril de 2023, que presentaron ante el foro apelado la *Moción Informativa Sobre Resultado de Evaluación Bajo CFPB,* mediante la cual informó que, la evaluación realizada culminó sin acuerdo y que, procedía la continuación de los procedimientos ordinarios. Conforme a lo anterior, en ese entonces, solicitó que el caso fuera referido a mediación compulsoria, de acuerdo a las disposiciones de la Ley Núm. 184-2012. Explicó que, el proceso de mediación compulsoria comenzó el 12 de enero de

2024 y terminó sin lograrse un acuerdo entre las partes. Lo anterior, debido a que la parte apelante no aceptó la alternativa aprobada por BPPR, de acuerdo la notificación expedida el 26 de marzo de 2024 por el Centro de Mediación de Conflictos. Es la postura de la parte apelada que, las alegaciones de la reconvención eran insuficientes para establecer una reclamación que justificara la concesión de un remedio, ya que no hacían referencia a hechos demostrativos ni específicos que apoyaran la procedencia en derecho del remedio solicitado. Arguyó que, la parte apelante intentaba inducir a error al foro primario al presentar alegaciones de hechos carentes de datos concretos y específicos.

La parte apelada aclaró que, la parte apelante no se había orientado el 5 de agosto de 2022, sino que, en dicha fecha se le había notificado la determinación de aprobación de venta a corto plazo. Añadió que, había sido BPPR quien le había dado seguimiento a la parte apelante ante su falta de notificar si aceptaba o no la alternativa propuesta. Cónsono con lo anterior, le remitió una misiva a la parte apelante el 20 de julio de 2023, donde le otorgó un término final de treinta (30) días para coordinar la fecha del cierre del *short sale* aprobado el 5 de agosto de 2022, y le advirtió que, vencido dicho término, tal alternativa sería inactivada. Asimismo, BPPR adujo que, transcurrido el término concedido, la alternativa aprobada había sido inactivada el 20 de agosto de 2023. Expresó que, más adelante, la parte apelante presentó una nueva solicitud de evaluación incompleta ante el Departamento de Mitigación de Pérdidas, por lo que, le notificaron las faltas y le otorgaron hasta el 30 de octubre de 2023, para completar la documentación. Sin embargo, la parte apelante completó su solicitud de evaluación el 14 de diciembre de 2023. De igual manera, resaltó que, una solicitud completa de evaluación ante el Departamento de Mitigación de Pérdidas no detiene los procedimientos no adjudicativos de un

procedimiento de ejecución de sentencia conforme a las disposiciones del CFPB.

En su moción, la parte apelada también mencionó que, una vez concluida la evaluación de la nueva solicitud, completada el 14 de diciembre de 2024, mediante misiva remitida el 5 de enero de 2024, le notificó a la parte apelante que se aprobó un *short sale*. Asimismo, en dicha misiva se le ofrecieron diferentes alternativas a la parte apelante, a saber:

> Opción A: Precio de venta de $100,000.00 más una aportación adicional de $122,411.00.
>
> Opción B: Precio de venta de $223,726.00 más una aportación adicional de $0.00.
>
> - De no aceptar o no poder vender la propiedad bajo los términos de short sale anteriormente descritos, como tercera alternativa se le aprobó una entrega voluntaria a través de una dación en pago.

La parte apelante no aceptó dicha oferta y sostuvo su decisión durante el proceso de mediación compulsoria, el cual terminó sin acuerdo y por ello, el caso fue devuelto al foro de primera instancia. BPPR sostuvo que, pese lo anterior, decidió concederle un término adicional de treinta (30) días a la parte apelante para coordinar la fecha de cierre de la alternativa de *short sale* aprobada el 5 de enero de 2024 y le apercibió que, transcurrido el mismo, la alternativa sería inactivada. Aseguró que, contrario a lo alegado por la parte apelante, el BPPR no estuvo solicitándole documentos por un periodo de un año y se retractó finalmente, sino que, esta no aceptó la oferta dentro de los términos provistos. También señaló que, las evaluaciones no necesariamente van a culminar otorgando exactamente las mismas alternativas ya que, cada una es independiente y basada en la información provista para cada una de ellas. Por otra parte, adujo que, contrario a lo alegado por la parte apelante sobre que no se le notificó sobre el término que duraba el *short sale*, de las notificaciones surgía que, sí se le notificó sobre

todos los términos del proceso. De igual forma, negó que se diera *dual tracking* dado que, el CPFB provee para que ciertos procedimientos se lleven a cabo, tales como emplazamientos, descubrimiento de prueba, mediaciones y vistas. Por tanto, razonó que, una evaluación en el Departamento de Mitigación de Pérdidas puede correr paralelamente con un proceso de mediación compulsoria y ello no implica *dual tracking*. El BPPR indicó que, ninguna de las alegaciones de la parte apelante sostenía la alegada mala fe de la apelada. Por último, solicitó al foro apelado que desestimara la reconvención instada por el señor Meléndez Torres.

En inmediata respuesta, la parte apelante presentó la *Oposición a "Moción Solicitando Desestimación Reconvención"*.

El 2 de diciembre de 2024 fue celebrada la *Vista Argumentativa*. Así las cosas, el 13 de febrero de 2025 la parte apelante presentó la *Moción Solicitando se Resuelva en Cuanto a Solicitud de Desestimación Reconvención y la Oposición*.

Transcurridos varios trámites procesales innecesarios pormenorizar, el 19 de febrero de 2025 el foro de primera instancia emitió la *Sentencia* cuya revisión nos ocupa. En primer lugar, el foro *a quo* determinó que, la notificación provista por el BPPR cumplió cabalmente con las disposiciones del CFPB, de conformidad con la Sección 1024.41(c)(1)(ii). Concluyó también que, el que se hubiese autorizado la continuación de los procedimientos y referido el caso a mediación compulsoria no constituía una violación a las disposiciones del CFPB. Lo anterior, ya que, la mediación compulsoria no es una acción dispositiva y tampoco está prohibida por el CPFB y, por lo tanto, no constituía *dual tracking*. Asimismo, entendió que, el CPFB no le imponía al BPPR el deber de proveerle al deudor alguna opción específica de mitigación de pérdida y que, nada en la sección 1024.41 confiere un derecho al prestatario a requerir y obligar al acreedor a que le otorgue a este una oferta de

pago bajo términos distintos a los aprobados y notificados. Es por lo que, dispuso que al señor Meléndez Torres no le asiste en ley un derecho de requerir que bajo la nueva evaluación se le otorgaran las mismas alternativas que le fueron previamente aprobadas el 5 de agosto de 2022. El foro *a quo* de igual manera, determinó que, dado a que la parte apelante no concretó una alternativa bajo la primera evaluación y al rechazar de plano las alternativas de la segunda evaluación, era su obligación cubrir cualquier cargo por demora que se acumulara conforme estipulado en el pagaré y su garantía hipotecaria. Si se hubiese concretado dentro de los parámetros establecidos por el CFPB, una de las ofertas provistas, la acumulación de cargos por demora hubiera sido interrumpida bajo los requerimientos del CFPB. Consecuentemente, dispuso:

> Por los fundamentos antes expuestos, se dicta la presente Sentencia mediante la cual se ordena la desestimación, con perjuicio, de la Reconvención instada por el codemandado FERDINAND MELÉNDEZ TORRES t/c/c FERDINAND ENRIQUE MELÉNDEZ TORRES, así como la concesión de los daños reclamados, y se declara Ha Lugar la moción de desestimación presentada por el BPPR.

> Entendemos que no existe razón para posponer esta Sentencia hasta que se dilucide la Demanda de autos, conforme instada por la parte demandante BPPR.

En desacuerdo con el dictamen emitido, la parte apelante presentó el 6 de marzo de 2025 *Moción Solicitando Reconsideración.* El foro primario mediante, Orden emitida el 18 de abril de 2025, indicó que se argumentaría en la Vista señalada.

El 21 de marzo de 2025, se celebró Conferencia con Antelación al Juicio.

El 3 de abril de 2025, el BPPR presentó *Réplica a Moción Solicitando Reconsideración a la Sentencia de Desestimación de Reconvención.*

En contestación a las mociones presentadas por las partes, el 11 de abril de 2025 el foro *a quo* emitió *Resolución Interlocutoria* en la que dispuso lo siguiente:

Evaluada la Solicitud de Reconsideración de la Sentencia de Desestimación a Reconvención [SUMAC 47] presentada por la parte codemandada, así como las posturas en Réplica a Solicitud de Reconsideración de la Parte demandante , acogemos los fundamentos de la parte demandante y los incorporamos por referencia, concluimos que los fundamentos expuestos por la parte codemandadas no nos mueven a variar nuestra Sentencia Parcial de Desestimación a Reconvención, por lo que declaramos NO HA LUGAR a la Solicitud de Reconsideración, [SUMAC 51].

Inconforme con lo resuelto, la parte apelante acudió ante este foro revisor mediante *Apelación*, en la cual esgrimió el siguiente señalamiento de error:

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA, SALA DE CAGUAS AL DESESTIMAR LA RECONVENCIÓN PRESENTADA EN TODAS SUS PARTES.

El 11 de junio de 2025, la parte apelada compareció mediante *Alegato en Oposición a Apelación.*

Con el beneficio de la comparecencia de las partes procedemos a resolver.

**II**

### A. *Deferencia Judicial*

Según es sabido, las determinaciones de hechos y de credibilidad del tribunal sentenciador deben ser merecedoras de gran deferencia por parte de los foros apelativos. *Argüello v. Argüello*, 155 DPR 62 (2001); *Pueblo v. Bonilla Romero*, 120 DPR 92, 111 (1987); *Hernández Maldonado v. Taco Maker*, 181 DPR 281 (2011); *SLG Rivera Carrasquillo v. AAA*, 117 DPR 345, 356 (2009); *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 779 (2022).

Sin embargo, la deferencia judicial no es absoluta, pues podrá ser preterida en ciertas instancias. Nuestro Máximo Foro ha reiterado que, los tribunales apelativos "no debemos intervenir con las determinaciones de los juzgadores de primera instancia, salvo

que medie pasión, prejuicio, parcialidad o error manifiesto". *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 741 (2007); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021); *SLG Rivera Carrasquillo v. AAA*, supra, pág. 356; *Ortiz Ortiz v. Medtronic*, supra, pág. 778, *Pueblo v. Hernández Doble*, 210 DPR 850, 864 (2022)[1].

No obstante, "la tarea de determinar cuándo un tribunal ha abusado de su discreción no es una fácil. Empero, no tenemos duda de que el adecuado ejercicio de discreción judicial está estrechamente relacionado con el concepto de razonabilidad". *SLG Zapata-Rivera v. J.F. Montalvo,* 189 DPR 414, 434-435 (2013). Es por lo que, nuestra más Alta Curia ha definido la discreción como "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera". *IG Builders et al. v. BBVAPR*, 185 DPR 307, 338 (2012). Así, la discreción se "nutr[e] de un juicio racional apoyado en la razonabilidad y fundamentado en un sentido llano de justicia; no es función al antojo o voluntad de uno, sin tasa ni limitación alguna". Ello "no significa poder para actuar en una forma u otra, haciendo abstracción del resto del Derecho". (Citas omitidas). *SLG Zapata-Rivera v. J.F. Montalvo*, supra, pág. 435.

### B. *Moción de Desestimación*

La Regla 10.2 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 10.2, faculta a la parte contra la cual se presente una alegación en su contra a presentar una moción de desestimación, por los fundamentos siguientes: 1) falta de jurisdicción sobre la materia; 2) falta de jurisdicción sobre la persona; 3) insuficiencia del emplazamiento; 4) insuficiencia del diligenciamiento del emplazamiento; 5) **dejar de exponer una reclamación que justifique la concesión de un remedio**, y 6) dejar de acumular una parte indispensable. *Inmob. Baleares et al. v. Benabe et al.*, 2024

---

[1] Véase también *Rodríguez et al. v. Hospital et al.*, 186 DPR 889, 908-909 (2012); *Dávila Nieves v. Meléndez Marín*, 187 DPR 750 (2013).

TSPR 112, 214 DPR ___ (2024); *Blassino, Reyes v. Reyes Blassino*, 2024 TSPR 93, 214 DPR ____ (2024); *Costas Elena y otros v. Magic Sports y otros*, 213 DPR 523, 533 (2024); *Cobra Acquisitions v. Mun. Yabucoa et al*, 210 DPR 384, 396 (2022); *Rivera Sanfeliz et al. v. Jta. Dir. First Bank*, 193 DPR 38, 49 (2015); *Colón Rivera et al. v. ELA*, 189 DPR 1033, 1049 (2013). La precitada regla permite a la parte demandada presentar una moción de desestimación debidamente fundamentada previo a contestar la demanda instada en su contra. *Conde Cruz v. Resto Rodríguez et. al.*, 205 DPR 1043, 1065 (2020); *Casillas Carrasquillo v. ELA*, 209 DPR 240, 247 (2022).

Al momento de considerar una moción de desestimación, los tribunales están obligados a tomar como ciertos todos los hechos bien alegados en la demanda y, a su vez, considerarlos de la forma más favorable a la parte demandante. *Cobra Acquisitions v. Mun. Yabucoa et al*, supra; *Casillas Carrasquillo v. ELA*, supra; *Rivera Sanfeliz et al. v. Jta. Dir. First Bank*, supra; *Cruz Pérez v. Roldán Rodríguez et al.*, 206 DPR 261, 267 (2021); *Colón Rivera et al. v. ELA*, supra. Luego, debe determinar si, a base de los hechos aceptados como ciertos, la demanda establece una reclamación plausible que justifique la concesión de un remedio. *Costas Elena y otros v. Magic Sports y otros*, supra, pág. 534. Si el Tribunal entiende que no se cumple con el estándar de plausibilidad, se debe desestimar la demanda, pues no debe permitir que proceda una reclamación insuficiente bajo el pretexto de que se podrán probar las alegaciones conclusorias con el descubrimiento de prueba. *Íd*. Véase, además, R. Hernández Colón, *Práctica jurídica de Puerto Rico: derecho procesal civil*, 6.a ed., San Juan, Ed. LexisNexis, 2017, pág. 307.

Es por lo que, para que proceda una moción de desestimación, "tiene que demostrarse de forma certera en ella que el demandante no tiene derecho a remedio alguno bajo cualquier estado de [D]erecho que se pudiere probar en apoyo a su reclamación, aun

interpretando la demanda lo más liberalmente a su favor".[2] *Cobra Acquisitions v. Mun. Yabucoa et al*, supra; *Casillas Carrasquillo v. ELA*, supra; *Cruz Pérez v. Roldán Rodríguez*, supra, págs. 267-268; *Rivera Sanfeliz, et al. v. Jta. Dir. FirstBank*, supra; *Díaz Vázquez et al. v. Colón Peña et al.*, supra. Bajo este criterio, procederá la desestimación de la demanda si aun interpretando la reclamación de forma liberal, no hay remedio alguno disponible en el estado de Derecho. *Blassino, Reyes v. Reyes Blassino*, supra.

Nuestra más Alta Curia ha reiterado que, una demanda no deberá ser desestimada a menos que la razón para solicitar el remedio no proceda bajo supuesto de derecho alguno, ni pueda ser enmendada con el propósito de subsanar cualquier posible deficiencia. *Díaz Vázquez et al. v. Colón Peña et al.*, supra.

### C. *Ley de ayuda al deudor hipotecario*

La Asamblea Legislativa tras evaluar la iniciativa del Gobierno Federal y a tenor del Real Estate Settlement Procedures Act, 12 U.S.C. 2601, *et seq.*, (RESPA) adoptó en nuestra jurisdicción el programa de Mitigación de Pérdidas "Loss Mitigation", a través de la Ley de Ayuda al Deudor Hipotecario, Ley Núm. 169 de 9 de agosto de 2016, 32 LPRA sec. 2891, *et seq.*, (en adelante Ley Núm. 169). Dicho estatuto fue creado a los fines de requerirle al acreedor de un préstamo en mora, que antes de iniciar cualquier proceso legal que pudiera culminar en una demanda de ejecución de hipoteca y cobro de dinero, le ofrezca al deudor hipotecario la alternativa de Mitigación de Pérdidas. Por consiguiente, tras la culminación de dicho proceso, y el deudor hipotecario conocer si cualifica o no para la aludida alternativa, entonces, el acreedor podrá comenzar un proceso legal ante los tribunales de Puerto Rico.

---

[2] *Ortiz Matías et al. v. Mora Development,* 187 DPR 649, 654 (2013*); López García v. López García,* 200 DPR 50, 69-70 (2018).

En virtud de ello, el Artículo 3 de la Ley Núm.169, *supra,* dispone:

> Tan pronto el acreedor hipotecario reciba por escrito un formulario de solicitud de mitigación de pérdidas por parte del deudor hipotecario, el acreedor hipotecario no podrá comenzar un proceso legal de cobro de dinero contra el deudor hipotecario, independientemente la cantidad adeudada o el tiempo que haya transcurrido sin que el deudor hipotecario haya hecho algún pago. Se aclara que dentro del tiempo que haya transcurrido se incluyen los ciento veinte (120) días de impago que podría tener un deudor hipotecario y que le daría la oportunidad al acreedor hipotecario de comenzar una demanda en cobro de dinero y ejecución hipotecaria. Bajo esta Ley, el acreedor hipotecario no podría comenzar un proceso legal, inclusive si el deudor posee ciento veinte (120) días de impago o más, si se comenzó un proceso de mitigación de pérdidas en o antes de estos ciento veinte (120) días y el deudor hipotecario no haya sido evaluado anteriormente dentro del término del antes mencionado periodo. Disponiéndose, que un acreedor hipotecario que cumple con lo dispuesto en 12 CFR 1024.41, según promulgado por el *Consumer Financial Protection Bureau,* se entenderá que está en cumplimiento con lo dispuesto en este Artículo.

> En el caso en que ya haya comenzado un proceso legal de cobro de dinero y ejecución hipotecaria, y el deudor hipotecario haya entregado el formulario solicitando mitigación de pérdidas y sometido los documentos requeridos para la evaluación de su caso el proceso legal deberá detenerse, según las disposiciones del Reglamento X, mientras se culmina el proceso de cualificación del deudor hipotecario y éste adviene en conocimiento de que cualifica o no. Lo anterior no aplicará en aquellos casos en los cuales se haya dictado una sentencia por el tribunal correspondiente, y la misma sea final, firme e inapelable.

Por igual, el Artículo 5 del aludido estatuto, establece que:

> El acreedor hipotecario podrá comenzar un proceso legal de cobro de dinero y ejecución hipotecaria, siempre y cuando se haya culminado el proceso de mitigación de pérdidas establecidos en esta Ley y los procesos del Reglamento X, y habiéndose notificado al deudor hipotecario, preservando los derechos del deudor ya establecidos en la Regulación X para poder apelar cualquier decisión.

Pertinente a la controversia ante nos, el Reglamento X (*Regulation X*), 12 CFR 1024.40-41, *et seq.,* dispone las opciones disponibles para un deudor que se encuentre en mora conforme a

las leyes y reglamentos pertinentes. En primer lugar, la sección 1024.40 establece lo siguiente:

(a) **In general.** A servicer shall maintain policies and procedures that are reasonably designed to achieve the following objectives:

(1) Assign personnel to a delinquent borrower by the time the servicer provides the borrower with the written notice required by § 1024.39(b), but in any event, no later than the 45th day of the borrower´s delinquency.

(2) Make available to a delinquent borrower, via telephone, personnel assigned to the borrower as described in paragraph (a)(1) of this section to respond to the borrower's inquiries, and as applicable, assist the borrower with available loss mitigation options until the borrower has made, without incurring a late charge, two consecutive mortgage payments in accordance with the terms of a permanent loss mitigation agreement.

(3) If a borrower contacts the personnel assigned to the borrower as described in paragraph (a)(1) of this section and does not immediately receive a live response from such personnel, ensure that the servicer can provide a live response in a timely manner.

(b) **Functions of servicer personnel**. A servicer shall maintain policies and procedures reasonably designed to ensure that servicer personnel assigned to a delinquent borrower as described in paragraph (a) of this section perform the following functions:

(1) Provide the borrower with accurate information about:

(i) Loss mitigation options available to the borrower from the owner or assignee of the borrower's mortgage loan;

(ii) Actions the borrower must take to be evaluated for such loss mitigation options, including actions the borrower must take to submit a complete loss mitigation application, as defined in § 1024.41, and, if applicable, actions the borrower must take to appeal the servicer's determination to deny a borrower's loss mitigation application for any trial or permanent loan modification program offered by the servicer;

**(iii)** The status of any loss mitigation application that the borrower has submitted to the servicer;

**(iv)** The circumstances under which the servicer may make a referral to foreclosure; and

**(v)** Applicable loss mitigation deadlines established by an owner or assignee of the borrower's mortgage loan or § 1024.41.

**(2)** Retrieve, in a timely manner:

**(i)** A complete record of the borrower's payment history; and

**(ii)** All written information the borrower has provided to the servicer, and if applicable, to prior servicers, in connection with a loss mitigation application;

**(3)** Provide the documents and information identified in paragraph (b)(2) of this section to other persons required to evaluate a borrower for loss mitigation options made available by the servicer, if applicable; and

**(4)** Provide a delinquent borrower with information about the procedures for submitting a notice of error pursuant to § 1024.35 or an information request pursuant to § 1024.36.

Es decir, la precitada sección enmarca las políticas y procedimientos que deben llevar a cabo las entidades que manejan los préstamos, en miras de cumplir los objetivos antes reseñados. También exige que, se le notifique al deudor en mora una notificación escrita no más tarde del día cuarentaicinco (45) de que entre en mora. Asimismo, se le debe proveer al deudor asistencia con cualquier duda que tenga, proveerle las opciones disponibles respecto a la mitigación de pérdidas y cómo iniciar dicho proceso, así como las alternativas de apelación en caso de que se le deniegue el proceso. En las instancias en que la entidad financiera no pueda contactarse de manera rápida con el deudor, esta deberá asegurarse que se le responderá en un tiempo razonable.[3]

---

[3] 12 CFR § 1024.40.

En relación a los procesos de mitigación de pérdidas, la sección 1024.41, "Loss Mitigation Procedures" dispone:

(1) **Complete loss mitigation application.** A complete loss mitigation application means an application in connection with which a servicer has received all the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower. A servicer shall exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application.

Es decir, una solicitud de mitigación de pérdidas completa significa que esta ha sido sometida con toda la información necesaria para que la institución financiera pueda evaluarla y explorar las alternativas disponibles para el deudor. Le corresponde a la institución financiera llevar a cabo las diligencias pertinentes para obtener los documentos y la información para así completar la solicitud de mitigación de pérdidas.

Por otra parte, en cuanto a la evaluación de la solicitud de *loss mitigation*, el inciso (c)(1) del mismo artículo estatuye lo siguiente:

(1) **Complete loss mitigation application.** Except as provided in paragraph (c)(4)(ii) of this section, if a servicer receives a complete loss mitigation application more than 37 days before a foreclosure sale, then, within 30 days of receiving the complete loss mitigation application, a servicer shall:

    (i) Evaluate the borrower for all loss mitigation options to the borrower; and

    (ii) Provide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage. The servicer shall include in this notice the amount of time the borrower has to accept or reject an offer of a loss mitigation program as provided for in paragraph (e) of this section, if applicable, and a notification, if applicable, that the borrower has the right to appeal the denial of any loan modification option as well as the amount of time the borrower has to file such an appeal and any requirements for making an appeal, as provided for in paragraph (h) of this section.

Este inciso, en esencia, establece que una vez completada la solicitud de *loss mitigation*, se deben evaluar todas las opciones de *loss mitigation*, y proveerle al deudor una notificación escrita junto a la determinación de la institución financiera. Dicha notificación deberá incluir el periodo disponible para que el deudor acepte o rechace la oferta realizada por la institución financiera como parte del proceso de *loss mitigation*. De igual manera, deberá incluir el derecho del deudor para apelar en caso de que no esté de acuerdo con la decisión de la institución financiera.[4]

Respecto a las solicitudes incompletas, se dispone que:

**(2) Incomplete loss mitigation application evaluation**

    **(i)**     **In general.** Except as set forth in paragraphs (c)(2)(ii) and (iii) of this section, a servicer shall not evade the requirement to evaluate a complete loss mitigation application for all loss mitigation options available to the borrower by offering a loss mitigation option based upon an evaluation of any information provided by a borrower in connection with an incomplete loss mitigation application.

    **(ii)**     **Reasonable time.** Notwithstanding paragraph (c)(2)(i) of this section, if a servicer has exercised reasonable diligence in obtaining documents and information to complete a loss mitigation application, but a loss mitigation application remains incomplete for a significant period of time under the circumstances without further progress by a borrower to make the loss mitigation application complete, a servicer may, in its discretion, evaluate an incomplete loss mitigation application and offer a borrower a loss mitigation option. Any such evaluation and offer is not subject to the requirements of this section and shall not constitute an evaluation of a single complete loss mitigation application for purposes of paragraph (i) of this section.

    **(iii)**     **Short-term loss mitigation options.** Notwithstanding paragraph (c)(2)(i) of this section, a servicer may offer a short-term payment forbearance program or a short-term repayment plan to a borrower based upon an evaluation of an incomplete loss mitigation application. Promptly after

---

[4] 12 CFR § 1024.41 (c)(b)(1).

offering a payment forbearance program or a repayment plan under this paragraph (c)(2)(iii), unless the borrower has rejected the offer, the servicer must provide the borrower a written notice stating the specific payment terms and duration of the program or plan, that the servicer offered the program or plan based on an evaluation of an incomplete application, that other loss mitigation options may be available, and that the borrower has the option to submit a complete loss mitigation application to receive an evaluation for all loss mitigation options available to the borrower regardless of whether the borrower accepts the program or plan. A servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process, and shall not move for foreclosure judgment or order of sale or conduct a foreclosure sale, if a borrower is performing pursuant to the terms of a payment forbearance program or repayment plan offered pursuant to this paragraph (c)(2)(iii). A servicer may offer a short-term payment forbearance program in conjunction with a short-term repayment plan pursuant to this paragraph (c)(2)(iii).

(iv) **Facially complete application.** A loss mitigation application shall be considered facially complete when a borrower submits all the missing documents and information as stated in the notice required under paragraph (b)(2)(i)(B) of this section, when no additional information is requested in such notice, or once the servicer is required to provide the borrower a written notice pursuant to paragraph (c)(3)(i) of this section. If the servicer later discovers that additional information or corrections to a previously submitted document are required to complete the application, the servicer must promptly request the missing information or corrected documents and treat the application as complete for the purposes of paragraphs (f)(2) and (g) of this section until the borrower is given a reasonable opportunity to complete the application. If the borrower completes the application within this period, the application shall be considered complete as of the date it first became facially complete, for the purposes of paragraphs (d), (e), (f)(2), (g), and (h) of this section, and as of the date the application was actually complete for the purposes of this paragraph (c). A servicer that complies with this paragraph (c)(2)(iv) will be deemed to have fulfilled its

obligation to provide an accurate notice under paragraph (b)(2)(i)(B) of this section.

En caso de que la solicitud del deudor sea denegada, el Reglamento X también le impone a la institución financiera el deber de notificarle al deudor las razones específicas por las cuales fue denegada. 12 CFR § 1024.41(d).

Por otro lado, el Reglamento X establece ciertas prohibiciones respecto a la ejecución de hipoteca, en específico:

**(f) Prohibition on foreclosure referral –**

**(1) Pre-foreclosure review period.** A servicer shall not make the first notice of filling required by applicable law for any judicial or non-judicial foreclosure process unless:

**(i)** A borrower's mortgage loan obligation is more than 120 days delinquent;

**(ii)** The foreclosure is based on a borrower's violation of a due-on-sale clause; or

**(iii)** The servicer is joining the foreclosure action of a superior or subordinate lienholder.

**(2) Application received before foreclosure referral.** If a borrower submits a complete loss mitigation application during the pre-foreclosure review period set forth in paragraph (f)(1) of this section or before a servicer has made the first notice of filing required by applicable law for any judicial or non-judicial foreclosure process, a servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless:

**(i)** The servicer has sent the borrower a notice pursuant to paragraph (c)(1)(ii) of this section that the borrower is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied;

**(ii)** The borrower rejects all loss mitigation options offered by the servicer; or

> > > **(iii)** The borrower fails to perform under an agreement on a loss mitigation option.
>
> > **(g) Prohibition on foreclosure sale.** If a borrower submits a complete loss mitigation application after a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process but more than 37 days before a foreclosure sale, a servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale, unless:
>
> > > **(1)** The servicer has sent the borrower a notice pursuant to paragraph (c)(1)(ii) of this section that the borrower is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied;
>
> > > **(2)** The borrower rejects all loss mitigation options offered by the servicer; or
>
> > > **(3)** The borrower fails to perform under an agreement on a loss mitigation option.

La interpretación oficial de la sección 1024.41(g), explica que, nada limita a la institución financiera para que continúe con el procedimiento de ejecución de hipoteca, incluyendo publicaciones, arbitraje o requisitos de mediación establecidos por la ley aplicable cuando el primer aviso o presentación de un procedimiento de ejecución de hipoteca haya ocurrido antes de que la institución financiera recibiera una solicitud completa de mitigación de pérdidas. Lo anterior procederá siempre y cuando estos no causen o resulten directamente en una sentencia de ejecución de hipoteca, una orden de venta o que se lleve a cabo una venta de ejecución hipotecaria en violación a la sección 1024.41.[5]

---

[5] Official interpretation of 41(g) Prohibition on foreclosure sale.
[...]
2. **Proceeding with the foreclosure process.** Nothing in § 1024.41(g) prevents a servicer from proceeding with the foreclosure process, including any publication, arbitration, or mediation requirements established by applicable law, when the first notice or filing for a foreclosure proceeding occurred before a servicer receives a complete loss mitigation application so long as any such steps in the foreclosure process do not cause or directly result in the issuance of a foreclosure judgment or order of sale, or the conduct of a foreclosure sale, in violation of § 1024.41.

Esbozada la normativa jurídica que enmarca la controversia de epígrafe, procedemos a aplicarla.

**III**

En su *único señalamiento de error*, la parte apelante sostiene que el foro primario incidió al desestimar la *Reconvención* presentada por esta.

Adelantamos que, no le asiste la razón. Veamos.

Según reseñáramos, el BPPR presentó una *Demanda* sobre cobro de dinero y ejecución de hipoteca en contra de la parte apelante. Por otro lado, la parte apelante presentó la *Contestación a Demanda y Reconvención*. En lo pertinente a la controversia de epígrafe, en su *Reconvención*, la parte apelante hizo varias alegaciones en cuanto a BPPR. En primer lugar, sostuvo que, el 5 de agosto de 2022 se había orientado con la División de *Loss Mitigation* de BPPR y que posteriormente, entregó todos los documentos requeridos para iniciar dicho procedimiento. Aseguró que, luego de lograr un acuerdo con el BPPR, este último se retiró del proceso de mala fe y que había sustentado su decisión bajo el fundamento de que la reglamentación federal limitaba el proceso a un año.

Se desprende del expediente que, el 5 de agosto de 2022, el BPPR le notificó a la parte apelante la oferta disponible para acogerse a un *short sale* y le apercibió sobre el tiempo para responder a tal notificación. La parte apelada le concedió al señor Meléndez Torres tiempo para decidir si aprobaba o no la oferta de *short sale* hecha por esta en dicha fecha.

Contrario a lo alegado por la parte apelante, el BPPR no se retiró del proceso de *loss mitigation* de mala fe, la realidad es que, el BPPR le brindó varias oportunidades a la parte apelante para responder a la primera propuesta de *short sale*, sin que esta hubiese accionado al respecto por más de un año. De hecho, surge del

expediente que, el BPPR le apercibió que, transcurrido el término concedido sin que la parte apelante aceptara o denegara la primera oferta de *short sale*, se inactivaría la misma y consecuentemente, tendría que iniciar un nuevo proceso. En específico, el 20 de julio de 2023, le concedió el término final de treinta (30) días para coordinar la fecha del cierre del *short sale* que el BPPR había aprobado el 5 de agosto de 2022. Dado a que la parte apelante no respondió, la parte apelada procedió a inactivar la alternativa de *short sale* el 20 de agosto de 2023. De ninguna forma el BPPR obligó a la parte apelante a realizar un segundo proceso. Pues, el segundo proceso lo inició la parte apelante de forma voluntaria como consecuencia de su inacción en el primer proceso.

En cuanto el proceso dual alegado por la parte apelante, la legislación federal permite que se gestionen varios procedimientos entre tanto se atiende el proceso de *loss mitigation*, entre ellos, se encuentran los emplazamientos, descubrimiento de prueba, mediaciones y vistas.[6] Es por lo que, el BPPR se encontraba facultado para solicitar al foro de primera instancia que se llevara a cabo un proceso de mediación compulsoria conforme provee la ley estatal.[7]

Cabe destacar que, como bien concluyó el foro primario, a la fecha de la presentación de la *Demanda* el 31 de mayo de 2022, no existía una solicitud completada ante el Departamento de Mitigación de Pérdidas del BPPR. No fue sino hasta el 10 de junio de 2022, que la parte apelante completó su solicitud de evaluación, al entregar toda la documentación requerida. Recordemos que, el Reglamento X dispone que una solicitud de mitigación de pérdidas completa surge cuando el deudor ha sometido la misma ante la institución financiera con toda la información necesaria para ser evaluada por

---

[6] 12 CFR § 1024.41(g) y (f).
[7] 12 CFR §1024.41

esta.[8]  A tales efectos, el BPPR presentó una moción ante el foro de primera instancia con el propósito de solicitar la paralización de los procedimientos, de conformidad con el 12 CFR 1024.41(g), debido a que la parte apelante había sometido la documentación necesaria para que su solicitud fuera evaluada. Por tanto, lo anterior tampoco constituye un proceso dual.

Ahora bien, respecto a la alegación de la parte apelante sobre que en la segunda evaluación, el BPPR modificó la cantidad previamente aprobada en la primera oferta de *short sale,* nada en la reglamentación federal o estatal obliga a la institución financiera a ofrecer los mismos términos en todas las evaluaciones que lleve a cabo. La segunda evaluación fue una independiente a la primera, realizada a base de la información disponible y provista por el deudor.[9]

De acuerdo al derecho reseñado, al momento de considerar una moción de desestimación, los tribunales están obligados a tomar como ciertos todos los hechos bien alegados en la demanda y, a su vez, considerarlos de la forma más favorable a la parte demandante.[10] Luego, debe determinar si, a base de los hechos aceptados como ciertos, la demanda establece una reclamación plausible que justifique la concesión de un remedio.[11] Si el Tribunal entiende que no se cumple con el estándar de plausibilidad, se debe desestimar la demanda, pues no debe permitir que proceda una reclamación insuficiente bajo el pretexto de que se podrán probar las alegaciones conclusorias con el descubrimiento de prueba.[12]

---

[8] 12 CFR §1024.41(1).
[9] 12 CFR §1024.41.
[10] *Cobra Acquisitions v. Mun. Yabucoa et al,* supra; *Casillas Carrasquillo v. ELA,* supra; *Rivera Sanfeliz et al. v. Jta. Dir. First Bank,* supra; *Cruz Pérez v. Roldán Rodríguez et al.,* 206 DPR 261, 267 (2021); *Colón Rivera et al. v. ELA,* supra.
[11] *Costas Elena y otros v. Magic Sports y otros,* supra, pág. 534.
[12] *Íd.* Véase, además, R. Hernández Colón, *Práctica jurídica de Puerto Rico: derecho procesal civil,* 6.a ed., San Juan, Ed. LexisNexis, 2017, pág. 307.

Aun tomando como ciertos todos los hechos bien alegados en la *Reconvención*, determinamos que, las alegaciones expuestas por la parte apelante en la *Reconvención* son insuficientes para establecer una reclamación que justifique la concesión de un remedio. Es por lo que procede la desestimación de la reconvención, conforme a la Regla 10.2 de Procedimiento Civil. Por tanto, no incidió el foro primario en su proceder.

**IV**

Por los fundamentos antes expuestos, se confirma el dictamen apelado.

Notifíquese.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones